UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | <u>COMPLAINT</u> |
| Plaintiff, | 23cv8542 |
| -against- | |
| ANTHONY VIGGIANO STEPHEN A. FORLANO CHRISTOPHER SALAMONE, and NATHAN BLECKLEY, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Securities and Exchange Commission, for its Complaint against Defendants Anthony Viggiano, Stephen A. Forlano, Christopher Salamone, and Nathan Bleckley, alleges as follows:

**SUMMARY**

1.      This case involves insider trading based on material nonpublic information unlawfully disclosed by Anthony Viggiano. Viggiano worked for an investment firm and then a global investment bank, where he learned about impending mergers and acquisitions and strategic partnerships before they were publicly announced. Viggiano tipped his friends, Forlano and Salamone, about the upcoming deals, and Forlano and Salamone bought and sold securities based on that information. Forlano also tipped other individuals, including Bleckley, who also traded on the basis of material nonpublic information originating from Viggiano.

2.      Viggiano knew that it was illegal for him to trade on, or tip others with, material nonpublic information that he learned through his employment. To try to cover his tracks, Viggiano asked Salamone to trade based on Viggiano's tips and gave Salamone cash for trading purposes; Viggiano instructed Salamone to download and communicate using an encrypted

messaging application; and Viggiano proposed that they split their illegal trading profits 50-50. Salamone agreed, and, as a result of trading on tips he received from Viggiano, Salamone gained approximately $322,000 in profits. Salamone gave Viggiano approximately $35,000 in cash from these illegal trading profits, with the intent to provide more.

3.      Viggiano also tipped Forlano—sending him, for example, a message with the name of a company about which Viggiano had just learned material nonpublic information circled in red. Forlano traded on the material nonpublic information he received from Viggiano, earning illegal trading profits of approximately $114,000. In addition to trading in his own account, Forlano passed the tips he received from Viggiano to at least five friends and family members. For example, Forlano sent Bleckley the stock symbol for a company with which Viggiano's employer was pursuing a strategic financing arrangement, telling Bleckley to try to buy by the following week because a "catalyst" was coming and "the news just needs to go public." Bleckley and the other friends and family Forlano tipped traded on those tips, earning profits of approximately $110,000.

4.      A chart reflecting the tipping and trading chain is below.



**VIOLATIONS**

5.      By virtue of the foregoing conduct and as alleged further herein, each Defendant

has violated Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.

§ 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Defendants Viggiano and

Salamone have also violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule

14e-3 thereunder [17 C.F.R. § 240.14e-3].

6.      Unless Defendants are restrained and enjoined, Defendants will engage in the

acts, practices, transactions, and courses of business set forth in this Complaint or in acts,

practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d) and 21A(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1(a)].

8.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay disgorgement and prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10.      Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

11.      Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including Viggiano's employment at the investment firm and investment bank, which included his acquisition of material nonpublic information about the transactions discussed in this Complaint. Further, during the relevant period, the securities Defendants traded were publicly traded on The Nasdaq Stock Market ("NASDAQ"), the OTC Link, or the New York Stock Exchange ("NYSE"), each of which is headquartered in New York,

New York.

## DEFENDANTS

12.     Anthony Viggiano ("Viggiano"), age 26, is a resident of Baldwin, New York. From approximately April 2021 to October 2021, Viggiano was employed as a New York City-based analyst with an investment firm (the "Investment Firm"). From February 2022 until July 2023, Viggiano was employed as an analyst and then an associate in the asset and wealth management division of a global investment bank (the "Investment Bank"), where he was assigned to one of its New York City offices.

13.     Stephen A. Forlano ("Forlano"), age 27, is a resident of Tampa, Florida and is a treasury analyst at a domestic real estate firm. Forlano and Viggiano went to college together and are close friends.

14.     Christopher Salamone ("Salamone"), age 35, is a resident of Long Beach, New York and is a sales representative in the construction industry. Salamone and Viggiano have known one another for 20 years; they grew up on the same block, and Salamone's mother and Viggiano's father are dating.

15.     Nathan Bleckley ("Bleckley"), age 26, is a resident of Altus, Oklahoma and is a captain in the United States Army. Bleckley and Forlano went to college together and are close friends.

## FACTS

**I.     VIGGIANO HAD ACCESS TO MATERIAL NONPUBLIC INFORMATION THAT HE WAS DUTY-BOUND TO KEEP CONFIDENTIAL.**

16.     Through his employment at the Investment Firm and the Investment Bank, Viggiano had access to, and did access, material nonpublic information about the public companies in the securities of which the trading alleged below occurred.

17.     Viggiano was employed as an analyst in the Investment Firm's Global Fund Finance group in New York. To perform his duties, Viggiano was entrusted with material nonpublic information concerning the Investment Firm, its affiliates and clients, transactions in which the Investment Firm and its affiliates and clients were involved, and the entities that were the subjects of those transactions.

18.     As a condition of his employment at the Investment Firm, Viggiano agreed to hold all confidential information—including, but not limited to, material nonpublic information—acquired through his employment at the Investment Firm in strict confidence, to not use such information for any purpose other than his employment, and to not disclose confidential information to any other person. The Investment Firm provided Viggiano with trainings, policies, and procedures concerning insider trading and its illegality. As an employee of the Investment Firm entrusted with material nonpublic information, Viggiano owed a duty to the firm to not disclose any material nonpublic information that he learned through the course of his employment.

19.     While employed at the Investment Firm, Viggiano personally traded in securities without first obtaining pre-clearance from the Investment Firm's legal and compliance department, in violation of Investment Firm policies. Viggiano informed his supervisor that he was resigning approximately one month after his trading was discovered by the Investment Firm.

20.     As an employee of the Investment Bank, Viggiano's duties included assisting the Investment Bank and its affiliates and clients in assessing various investment opportunities, including in private-equity funds, public companies, and others, including supporting investing teams in structuring and closing investments.

21.     To perform his duties, Viggiano was regularly entrusted with material nonpublic

6

information concerning the Investment Bank, its affiliates and clients, various deals in which the Investment Bank and its affiliates and clients were involved, and the entities that were the subjects of those deals.

22. As a condition of his employment, Viggiano agreed to hold all confidential information—including, but not limited to, material nonpublic information—acquired as a result of his employment with the Investment Bank in strict confidence, to not use such information for any purpose other than his employment, and to not disclose confidential information to any other person. The Investment Bank provided Viggiano with trainings, policies, and procedures regarding insider trading and its illegality. Throughout his employment with the Investment Bank, Viggiano owed a duty to the Investment Bank to not disclose any material nonpublic information, including any material nonpublic information related to deals or transactions on which he was working.

**A. Viggiano Had Access to Material Nonpublic Information About the AIG Deal.**

23. On July 14, 2021, at 4:20 p.m. Eastern Time, a press release announced that American International Group, Inc. ("AIG") had entered into a strategic partnership with the Investment Firm, including a sale of certain AIG assets to the Investment Firm. As a result of this announcement, on July 15, AIG's stock price closed at $48.07, an increase of $1.66, or 3.58% as compared to the stock's prior closing price of $46.41 on July 14. At the time, AIG's securities were listed and traded on NYSE.

24. On information and belief, through his employment at the Investment Firm, Viggiano had access to, and was personally aware of, material nonpublic information concerning AIG's strategic partnership with the Investment Firm, including a sale of certain AIG assets to the Investment Firm.

25.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding AIG and the AIG Deal was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Firm, he was required to maintain the confidentiality of this material nonpublic information.

**B. Viggiano Received Material Nonpublic Information About the HRMY Deal.**

26.     On August 10, 2021, at 7:30 a.m. Eastern Time, a press release announced that Harmony Biosciences Holdings Inc. ("HRMY") and the Investment Firm had entered into a strategic financing collaboration. As a result of this announcement, on August 10, HRMY's stock price closed at $30.16, an increase of $3.39, or 12.66% as compared to the stock's prior closing price of $26.77 on August 9. At the time, HRMY's securities were listed and traded on NASDAQ under the ticker "HRMY."

27.     As part of his employment at the Investment Firm, Viggiano had access to, and was personally aware of, material nonpublic information concerning the Investment Firm's strategic financing collaboration with HRMY. As early as July 26, 2021, Viggiano received material nonpublic information about the Investment Firm's investment in HRMY. By the evening of August 4, 2021, Viggiano learned that the closing of that investment was scheduled for August 9, 2021.

28.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding HRMY and the HRMY Deal was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Firm, he was required to maintain the confidentiality of the material nonpublic information.

**C. Viggiano Received Material Nonpublic Information About the CDK Deal.**

29.     On April 7, 2022, at 7:00 a.m. Eastern Time, a press release announced that a global investment company and its institutional partners had reached agreement to acquire CDK Global Inc. ("CDK") for $54.87 per share in a tender offer transaction valued at approximately $8.3 billion (the "CDK Deal"). As a result of this announcement, on April 7, CDK's stock price closed at $54.50, an increase of $5.51, or 11.25% as compared to the stock's prior closing price of $48.99 on April 6, 2022. At the time, CDK's securities were listed and traded on NASDAQ under the ticker "CDK."

30.     The Investment Bank was one of a number of banks that led the financing of the CDK Deal.

31.     By a least March 29, 2022, the investment company had taken substantial steps to commence the tender offer, including undertaking efforts to arrange financing by contacting the Investment Bank about on opportunity to participate in financing the deal.

32.     Viggiano was notified about the potential deal in connection with his employment at the Investment Bank and had material nonpublic information about CDK, including the potential CDK Deal, by at least March 29, 2022.

33.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding CDK and the CDK Deal was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Bank, he was required to maintain the confidentiality of the material nonpublic information.

**D. Viggiano Received Material Nonpublic Information About the CSVI Deal.**

34.     On August 22, 2022, at 9:00 a.m. Eastern Time, a press release announced that

Computer Services, Inc. ("CSVI") had agreed to be acquired (the "CSVI Deal"). As a result of this announcement, on August 22, 2022, CSVI's stock price closed at $56.75, an increase of $18.87, or 49.82% as compared to the stock's prior closing price of $37.88 on August 19, 2022. At the time, CSVI's securities were quoted and traded on OTC Link.

35.     The Investment Bank served as a financial advisor to the acquiring parties in connection with the CSVI Deal.

36.     Viggiano was notified about the potential deal in connection with his employment at the Investment Bank and had material nonpublic information about CSVI, including the potential CSVI Deal, by at least August 9, 2022.

37.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding CSVI and the CSVI Deal was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Bank, he was required to maintain the confidentiality of the material nonpublic information.

**E.  Viggiano Received Material Nonpublic Information About the ECOM Deal.**

38.     On September 6, 2022, at 7:30 a.m. Eastern Time, a press release announced that ChannelAdvisor Corporation ("ECOM") had agreed to be acquired for $23.10 per share (the "ECOM Deal"). As a result of this announcement, on September 6, 2022, ECOM's stock price closed at $22.79, an increase of $8.09, or 55.03% as compared to the stock's prior closing price of $14.70 on September 2, 2022. At the time, ECOM's securities were listed and traded on the New York Stock Exchange.

39.     An affiliate of the Investment Bank was an investor that participated in the ECOM Deal.

40.     Viggiano was notified about the potential deal in connection with his employment at the Investment Bank and had material nonpublic information about ECOM, including the potential ECOM Deal, by at least August 8, 2022. Viggiano received additional material nonpublic information about ECOM and the ECOM Deal on, among other dates, August 31, 2022.

41.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding ECOM and the ECOM Deal was nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Bank, he was required to maintain the confidentiality of the material nonpublic information.

**F.  Viggiano Received Material Nonpublic Information About the MAXR Deal.**

42.     On December 16, 2022, at 7:00 a.m. Eastern Time, a press release announced that Maxar Technologies ("MAXR") had agreed to be acquired in an all-cash transaction valued at approximately $6.4 billion (the "MAXR Deal"). As a result of this announcement, on December 16, MAXR's stock price closed at $51.93, an increase of $28.83, or 124.81% as compared to the stock's prior closing price of $23.10 on December 15. At the time, MAXR's securities were listed and traded on the New York Stock Exchange.

43.     The Investment Bank served as a financial advisor to the acquiring company in connection with the MAXR Deal.

44.     Viggiano was notified about the potential deal in connection with his employment at the Investment Bank and had material nonpublic information about MAXR, including the potential MAXR Deal, by at least November 15, 2022.

45.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing

that this information regarding MAXR and the MAXR Deal was material and nonpublic.

Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in

connection with his employment at the Investment Bank, he was required to maintain the

confidentiality of the material nonpublic information.

**G.  Viggiano Received Material Nonpublic Information About the ATCX Deal.**

46.     On January 31, 2023, at 9:00 a.m. Eastern Time, a press release announced that

Atlas Technical Consultants, Inc. ("ATCX") had agreed to be acquired in an all-cash transaction

valued at approximately $1.05 billion (the "ATCX Deal"). As a result of this announcement, on

January 31, 2023, ATCX's stock price closed at $12.13, an increase of $6.66, or 121.76% as

compared to the stock's prior closing price of $5.47 on January 30, 2023. At the time, ATCX's

securities were listed and traded on NASDAQ.

47.     By at least January 20, 2023, the Investment Bank was working with two firms in

connection with contemplated bids to acquire ATCX.

48.     By January 20, 2023, in connection with his employment with the Investment

Bank, Viggiano had material nonpublic information about ATCX, including that efforts to take it

private were underway by the Investment Bank and others.

49.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing

that this information regarding ATCX and a potential take- private transaction involving ATCX

was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously

avoided knowing that, in connection with his employment at the Investment Bank, he was

required to maintain the confidentiality of the material nonpublic information.

**H.  Viggiano Received Material Nonpublic Information About the SYNH Deal.**

50.     On May 10, 2023, at 6:47 a.m. Eastern Time, a press release announced that

Syneos Health, Inc. ("SYNH") had agreed to be acquired by a consortium of private investment firms for $43 per share in a cash transaction valued at approximately $7.1 billion (the "SYNH Deal"). As a result of this announcement, on May 10, 2023, SYNH's stock price closed at $41.85, an increase of $3.40, or 8.84% as compared to the stock's prior closing price of $38.45 on May 9, 2023. At the time, SYNH's securities were listed and traded on NASDAQ.

51.     An affiliate of the Investment Bank provided financing for the SYNH Deal.

52.     By at least February 18, 2023, Viggiano was notified about the potential deal in connection with his employment at the Investment Bank and had material nonpublic information about SYNH, including the potential SYNH Deal.

53.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that this information regarding SYNH and the SYNH Deal was material and nonpublic. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that, in connection with his employment at the Investment Bank, he was required to maintain the confidentiality of the material nonpublic information.

## II.   VIGGIANO TIPPED SALAMONE WITH MATERIAL NONPUBLIC INFORMATION ABOUT DEALS AT THE INVESTMENT BANK.

### A. Viggiano and Salamone Were Friends Who Tried to Hide Their Illegal Conduct.

54.     Viggiano and Salamone have known each other for approximately 20 years, and they have a close, personal relationship. They grew up on the same block, and Viggiano continues to live near Salamone's mother; Salamone's mother and Viggiano's father are romantic partners. During the past few years, Viggiano and Salamone saw one another regularly in person and communicated regularly by telephone, text message, and SIGNAL, an encrypted messaging application.

55.     On or around June 27, 2023—after the trading by Salamone based on material

nonpublic information from Viggiano, alleged below—Viggiano told Salamone that he had been approached by law enforcement. Viggiano told Salamone not to worry, because they had traded the right way using "smokescreens" to avoid detection. In addition, they had been communicating about trading using SIGNAL, an application that Viggiano said would prevent others from reading their messages.

**B. Viggiano Tipped, and Salamone Traded on, Material Nonpublic Information.**

    **1. Viggiano tipped Salamone about the CDK, CSVI, ECOM, MAXR, ATCX, and SYNH Deals.**

56.    Viggiano gave Salamone stock recommendations beginning in approximately 2020 and has made several stock recommendations to Salamone since that time.

57.    After he started work at the Investment Bank, Viggiano told Salamone that he could no longer personally trade stocks or have businesses because of documents he had signed at the Investment Bank.

58.    In or around August 2022, Viggiano proposed that he and Salamone enter into a trading agreement whereby they would trade in Salamone's brokerage account and split the profits and losses from the trading equally. Shortly thereafter, Viggiano gave Salamone cash for trading. Salamone transferred an equivalent amount of money from his bank account to his brokerage account for trading.

59.    In late 2022, Viggiano and Salamone agreed to be more careful to not leave a trail of their communications relating to their trading in Salamone's brokerage accounts. Going forward, they would communicate in person or using SIGNAL. Viggiano told Salamone to download SIGNAL for future communications so no one could read their messages and their messages would not be preserved. Viggiano set the conversation rules in SIGNAL so that chats would expire five-minutes after they ended.

60.     Salamone knew, was reckless in not knowing, or consciously avoided knowing that Viggiano was getting information about the Deals through his employment at the Investment Bank. For example, Viggiano once told Salamone that he knew a deal was going to happen because the Investment Bank office was crazy as everyone was working to get the deal done before the end of the year.

61.     For some of their trades, Viggiano instructed Salamone to buy multiple stocks, often in the same sector, in order to provide a "smokescreen" narrative in case they were questioned about their trading. For example, when they purchased MAXR securities, they also purchased securities in four other defense-related companies so they could say they were buying defense stocks in anticipation of a possible "World War III."

62.     At one point, Viggiano told Salamone to open another brokerage account to help cover their tracks, and Salamone opened an E-Trade account.

63.     Salamone paid taxes for the trading profits he made in 2022, and Viggiano indicated that he was upset that Salamone had done so.

64.     In early 2023, Viggiano and Salamone discussed setting up a Dubai company and using it for future trading so that they could avoid paying United States taxes. Viggiano and Salamone flew to Houston, Texas in February 2023 and met with an accountant to discuss setting up such a company. Viggiano tried to have everything set up in Salamone's name. And, after they met with the accountant, Viggiano deleted his public LinkedIn page that disclosed his employment history. They ultimately did not set up a Dubai company for trading.

65.     Prior to the public announcements of the CDK, CSVI, ECOM, MAXR, ATCX, and SYNH Deals, Viggiano tipped Salamone with material nonpublic information about those companies and/or the Deals so that Salamone could trade on the information.

2. **Salamone traded in CDK, CSVI, ECOM, MAXR, ATCX, and SYNH securities based on Viggiano's tips.**

66.     Salamone traded in securities based on Viggiano's tips of material nonpublic information.

67.     On April 4, 2022, Salamone purchased 40 shares of CDK stock. On April 8, 2022, after the CDK Deal was announced, Salamone sold all 40 shares of CDK stock, resulting in trading profits of approximately $206.

68.     On August 19, 2022, Salamone bought 135 shares of CSVI stock. On August 22, 2022, after the CSVI Deal was announced, Salamone sold all 135 shares of CSVI stock, resulting in trading profits of approximately $2,530.

69.     On August 31, 2022—the same day that Viggiano received additional material nonpublic information about ECOM and the ECOM Deal—Salamone bought 1,700 shares of ECOM stock. On September 6, 2022, after the ECOM Deal was announced, Salamone sold all 1,700 shares of ECOM stock, resulting in trading profits of approximately $12,851.

70.     Between December 8 and December 15, 2022, Salamone bought a total of 200 MAXR call option contracts, across two different call option series. Salamone did not know how to trade options. On or around December 8, 2022, he and Viggiano met in New York City, and Viggiano used Salamone's phone to enter MAXR options trades in Salamone's brokerage account. On December 16, after the MAXR Deal was announced, Salamone sold all 200 MAXR call option contracts, resulting in trading profits of approximately $284,016.

71.     Between January 24 and January 27, 2023, Salamone bought a total of 3,500 shares of ATCX stock. On January 31, after the ATCX Deal was announced, Salamone sold all 3,500 shares of ATCX stock, resulting in trading profits of approximately $22,993.

72.     Between February 23 and April 20, 2023, Salamone traded in two different series

16

of SYNH call option contracts. Salamone's trading in these SYNH call option contracts was ultimately not profitable because the SYNH share price did not increase above the strike price in the options.

**C. Viggiano and Salamone Acted with Scienter.**

73.     Viggiano tipped his close friend, Salamone, with material nonpublic information regarding CDK, CSVI, ECOM, MAXR, ATCX, and SYNH and the Deals outlined above.

74.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing that the information he tipped was material and nonpublic and that he was breaching his duty to the Investment Bank by disclosing material nonpublic information to Salamone. Viggiano also knew, was reckless in not knowing, or consciously avoided knowing that the information he communicated would be used for trading.

75.     Salamone purchased the CDK, CSVI, ECOM, MAXR, ATCX, and SYNH securities outlined above while in possession of and based on material nonpublic information that Viggiano unlawfully provided to Salamone.

76.     Salamone knew, was reckless in not knowing, or consciously avoided knowing that the information he had when he made the purchases of CDK, CSVI, ECOM, MAXR, ATCX, and SYNH securities alleged above was material and nonpublic and was disclosed in breach of a duty of trust and confidence for a personal benefit.

77.     Salamone knew or had reason to know that the material nonpublic information about the CDK Deal had been acquired directly or indirectly from an insider to the CDK Deal negotiations—that is, from an employee or an agent of the target company, or the acquiring company, or an advisor acting on behalf of one of those companies in connection with the transaction.

### D. Viggiano Obtained a Personal Benefit for Tipping Salamone.

78.    Salamone and Viggiano agreed to split their profits and losses from their trading in Salamone's brokerage account equally, and Viggiano provided cash to Salamone for trading purposes; Salamone transferred an equivalent amount of money to his brokerage account so that they could trade on Viggiano's material nonpublic information from the Investment Bank.

79.    On January 4, 2023, Salamone transferred $80,000 of the illegal trading proceeds from his brokerage account to his bank account; the same day, he withdrew $20,000 in cash from his bank account. He then hand-delivered the $20,000 in cash to Viggiano. Salamone subsequently delivered another $15,000 in cash to Viggiano over the course of two or three deliveries. Salamone intended to give Viggiano more cash, since their agreement called for a 50-50 split of their trading profits, but Viggiano told Salamone to leave the profits in Salamone's brokerage account for future trades.

80.    Viggiano received a personal benefit from his tip of material nonpublic information to Salamone, including at least $35,000 in cash, with the expectation of additional cash, as well as the benefit of providing a gift of inside information to a close friend.

## III.   VIGGIANO TIPPED FORLANO WITH MATERIAL NONPUBLIC INFORMATION ABOUT DEALS AT THE INVESTMENT FIRM AND THE INVESTMENT BANK.

### A. Viggiano and Forlano Have a Close, Personal Relationship.

81.    Viggiano and Forlano have known each other and been close friends since college. Viggiano and Forlano communicate regularly by phone, text message, and other means.

### B. Viggiano Tipped, and Forlano Traded on, Material Nonpublic Information.

#### 1.   Viggiano tipped Forlano about the AIG, HRMY, ECOM, and MAXR Deals.

82.    Viggiano tipped Forlano with material nonpublic information regarding AIG, HRMY, ECOM, and MAXR and/or the AIG, HRMY, ECOM, and MAXR Deals.

83.     Viggiano told Salamone that he provided material nonpublic information to Forlano.

84.     Forlano, in turn, provided tips he received from Viggiano to others, including Bleckley. Forlano provided Bleckley with material nonpublic information that Forlano had received from Viggiano about AIG, HRMY, and ECOM.

85.     On November 15, 2022—the same day on which Viggiano received material nonpublic information about the MAXR Deal—Viggiano sent Forlano a message with an image of an Air Force Base with "Maxar" circled in red; moreover, Forlano told a relative that he knew from a friend that MAXR was going to be acquired.

**2.   Forlano traded in HRMY, ECOM, and MAXR securities based on Viggiano's tips.**

86.     Forlano traded in the securities of HRMY, ECOM, and MAXR, while in possession of and based on the material nonpublic information provided to him by Viggiano.

87.     On the afternoon of August 9, 2023, Forlano bought a total of 435 shares of HRMY stock. Between August 10 and August 11, after the HRMY Deal was announced, Forlano sold his shares of HRMY stock, resulting in trading profits of approximately $1,528.

88.     On August 31, 2022, Forlano bought 250 shares of ECOM stock. On September 1, 2022, Forlano sold all 250 shares of ECOM stock, for a small loss. Between September 1 and September 2, 2022, Forlano bought a total of 122 ECOM call option contracts. On September 6, 2022, after the ECOM Deal was announced, Forlano sold all 122 ECOM call option contracts, resulting in trading profits of approximately $61,457.

89.     Between November 28 and November 30, 2022, Forlano bought 35 MAXR call option contracts. On December 2, 2022, Forlano sold all 35 MAXR call option contracts for a small profit. Between December 6 and December 14, 2022, Forlano bought a total of 44 MAXR

call option contracts in two different call option series. On December 16, 2022, after the MAXR

Deal was announced, Forlano sold all 44 MAXR call option contracts, resulting in trading profits

of approximately $50,603.

### C.  Viggiano and Forlano Acted with Scienter.

90.     Viggiano tipped his close friend, Forlano, with material nonpublic information

regarding AIG, HRMY, ECOM, and MAXR.

91.     Viggiano knew, was reckless in not knowing, or consciously avoided knowing

that the information he tipped was material and nonpublic and that he was breaching his duty to

the Investment Firm or the Investment Bank by disclosing material nonpublic information to

Forlano. Viggiano knew, was reckless in not knowing, or consciously avoided knowing that the

information he tipped would be used for trading.

92.     Forlano purchased HRMY, ECOM, and MAXR securities based on material

nonpublic information that Viggiano unlawfully provided to Forlano.

93.     Forlano knew, was reckless in not knowing, or consciously avoided knowing that

the information he had when he made the purchases of HRMY, ECOM, and MAXR securities

alleged above was material and nonpublic and was disclosed in breach of a duty of trust and

confidence for a personal benefit.

### D.  Viggiano Obtained a Personal Benefit for Tipping Forlano

94.     Viggiano received a personal benefit from his tip of material nonpublic

information to Forlano, including the benefit of providing a gift of inside information to a close

friend.

## IV.   FORLANO TIPPED BLECKLEY BASED ON MATERIAL NONPUBLIC INFORMATION FROM VIGGIANO.

### A.  Forlano and Bleckley Have a Close, Personal Relationship.

95.    Bleckley and Forlano met in approximately 2014. They both attended college at the University of Tampa, and they were roommates for a time.

96.    Bleckley and Forlano are good friends and have communicated regularly over the past few years.

### B.  Forlano Tipped Bleckley with Material Nonpublic Information from Viggiano.

### 1.  Forlano tipped Bleckley about the AIG Deal.

97.    On July 9, 2021, Forlano told Bleckley via text message that he should buy AIG stock.

98.    Bleckley did not purchase AIG stock.

99.    On July 14, 2021, the day the AIG Deal was announced, Forlano and Bleckley had the following text message exchange:

- Forlano: "aig boom," "did u buy in??"

- Bleckley: "Nah . . . not on AIG just Bc my funds are low," "Great call sorry I wasted it."

- Forlano: "broooo I didnt wanna leave a trail but rigatoni literally works for [IF]."

100.    "Rigatoni" was a nickname for Viggiano, and "[IF]" meant the Investment Firm where Viggiano worked.

101.    Bleckley responded to Forlano by text message: "Bro You know the f[**]king code dont u"; "If you say 'mallard of all mallards' I know fire away with everything I got," and "F[**]k u should've told me f[**]k the feds." Forlano "loved" Bleckely's text about mallards; mallard or duck was their shorthand for a sure thing.

102.     Later on July 14, 2021, Bleckley sent Forlano the following text messages (among others): "Bro ya next time just say mallard of all mallards," "I will follow suit," and "Whenever you do tht just know I'll do it with you b[r]o."

103.     Forlano responded via text message, "next one i got you'll be the first to know."

**2.  Forlano tipped Bleckley about the HRMY Deal.**

104.     On July 27, 2021, Forlano and Bleckley exchanged text messages that included material nonpublic information about HRMY that Forlano received from Viggiano. Their exchange included, but was not limited to, the following:

- Forlano: "hrmy," "hop the fuck on"

- Bleckley: "What?"

- Forlano: "$HRMY"

- Bleckley: "Let me peep . . ."

- Forlano: "trust me, big play on this"

- Bleckley: "Timeline?"

- Forlano: "try and get in before aug 2ish,"

- Bleckley: "Roger that $"

- Forlano: "feel free to spread it around it just shouldn't be coming from me lmfao," "a catalyst is coming next week."

105.     Beginning the next day, July 28, 2021, Forlano sent Bleckley the following text messages:

- "august 10 earnings,"

- "big day tmrw," "the news just needs to go public," "that ik"

- "like that may be why [IF] is so horny about buying equity in them,"

- "earnings also beat lol," "100%," "that will be out in AM," and

- "go mallard baby."

106.    On July 28, 2021, Bleckley sent a text message to five friends and family members in a finance text group, saying "You guys need to check out HRMY, just picked up 380 shares. Earnings on august 2nd . . . ."

107.    Between July 28 and August 9, 2021, Bleckley bought a total of 526 shares of HRMY stock. After the HRMY Deal was announced on August 10, 2021, Bleckley sold all 526 shares of HRMY stock between August 13 and August 23, 2021 stock. In total, Bleckley's HRMY trading profits for the shares he held going into the August 10 announcement were approximately $1,735.

### 3.  Forlano tipped Bleckley about the ECOM Deal.

108.    Viggiano tipped Forlano with material, nonpublic information about ECOM and the ECOM Deal, and Forlano passed the tip on to Bleckley.

109.    On or before August 31, 2022, Forlano instructed Bleckley to use XBOX audio chat to communicate. Using the XBOX audio chat, Forlano told Bleckley that ECOM would get acquired soon, including telling Bleckley an expected purchase price per share. Bleckley understood that the ECOM material nonpublic information he received from Forlano came from Viggiano.

110.    On August 31, 2022, Bleckley bought a total of 1,057 shares of ECOM stock, and 50 ECOM call option contracts, across two different call option series. On September 6, 2022, after the ECOM Deal was announced, Bleckley sold all 1,057 shares of ECOM stock and 50 ECOM call option contracts, resulting in trading profits of approximately $23,003.

### C.  Forlano and Bleckley Acted with Scienter.

111.    Viggiano tipped his close friend, Forlano, with material nonpublic information regarding AIG, HRMY, and ECOM.

112.    Forlano, in turn, tipped his close friend, Bleckley, based on the material nonpublic

23

information regarding AIG, HRMY, and ECOM that Forlano received from Viggiano.

113.    Forlano unlawfully communicated to Bleckley material nonpublic information that he received from Viggiano. Forlano knew, was reckless in not knowing, or consciously avoided knowing that the information he communicated was material nonpublic information, was disclosed in breach of a duty of trust and confidence for personal benefit, and would be used for trading.

114.    Bleckley purchased HRMY and ECOM securities based on material nonpublic information that he received from Forlano despite knowing, consciously avoiding knowing, or being reckless in not knowing, that the information was material and nonpublic and was disclosed in breach of a duty of trust and confidence for a personal benefit.

**D. Forlano Obtained a Personal Benefit for Tipping Bleckley.**

115.    Forlano received a personal benefit from his tip of material nonpublic information to Bleckley, including the benefit of providing a gift of inside information to a close friend.

## V.    FORLANO TIPPED AT LEAST FOUR OTHER TRADERS BASED ON MATERIAL NONPUBLIC INFORMATION FROM VIGGIANO.

**A. Forlano Had a Close, Personal Relationship with the Others He Tipped.**

116.    In addition to trading in his own account based on material nonpublic information and tipping Bleckley, Forlano also tipped two close family members ("Relative 1" and "Relative 2"), a friend and former roommate ("Friend 1"), and a friend and former co-worker ("Friend 2") to trade in securities based on the material nonpublic information that Forlano had received from Viggiano. Forlano had a close personal relationship with each of these individuals.

**B. Forlano Tipped Relative 1 about HRMY, and Relative 1 Traded on Forlano's Tip.**

117.    On or before July 29, 2021, Forlano tipped Relative 1 about HRMY based on material nonpublic information that Forlano had received from Viggiano.

118.     Relative 1 began buying HRMY stock on July 29, 2021, the same day that Forlano started buying shares, and, like Forlano, Relative 1 stopped buying shares of HRMY on August 9, 2021. Between July 29 and August 9, 2021, Relative 1 bought 75 shares of HRMY stock. Between August 11 and August 20, after the HRMY Deal was announced, Relative 1 sold 50 shares of HRMY stock, resulting in trading profits of approximately $227.

### C.  Forlano Tipped Friends 1 and 2 about ECOM, and They Traded on Forlano's Tips.

119.     Forlano tipped Friend 1 about ECOM.  Forlano told Friend 1 that he had a friend in New York from whom the tip originated. Forlano showed Friend 1 how to buy options.

120.     On Forlano's recommendation, Friend 1 began buying ECOM securities on August 31, 2022, the same day that Forlano started buying shares. Between August 31 and September 2, 2022, Friend 1 bought a total of 15 shares of ECOM stock and 10 ECOM call option contracts. On September 6, after the ECOM Deal was announced, Friend 1 sold all 15 shares of ECOM stock and 10 ECOM call option contracts, resulting in trading profits of approximately $5,196.

121.     Forlano also suggested to Friend 2 that he purchase ECOM and told Friend 2 which ECOM option contracts to purchase.

122.     Friend 2 began buying ECOM securities on August 31, 2022, the same day that Forlano started buying shares. Between August 31 and September 1, 2022, Friend 2 bought a total of 8 ECOM call option contracts. On September 6, after the ECOM Deal was announced, Friend 2 sold all 8 ECOM call option contracts, resulting in trading profits of approximately $4,079.

### D.  Forlano Tipped Relatives 1 and 2 about MAXR, and They Traded on His Tips.

123.     Forlano tipped Relatives 1 and 2 to purchase MAXR securities based on the material nonpublic information that Forlano had received from Viggiano.

124.    Relative 1 began purchasing MAXR shares and call option contracts on
November 28, 2022, the same day that Forlano began purchasing MAXR securities. Relative 1
stopped buying MAXR securities on December 15, 2022, the day after Forlano stopped buying
MAXR securities. Between November 28 and December 15, 2022, Relative 1 bought a total of
30 shares of MAXR stock and 60 MAXR call option contracts. On December 16, after the
MAXR Deal was announced, Relative 1 sold all 30 shares of MAXR stock and 60 MAXR call
option contracts, resulting in trading profits of approximately $67,146.

125.    Forlano also told Relative 2 to purchase MAXR, and Relative 2 did so based on
Forlano's recommendation. Forlano told Relative 2 that he knew about the MAXR Deal from a
friend. Between December 2 and December 15, 2022, Relative 2 bought a total of 15 shares of
MAXR stock and 5 MAXR call option contracts. On December 16, after the MAXR Deal was
announced, Relative 2 sold 10 shares of MAXR stock and all 5 MAXR call option contracts. In
total, Relative 2's MAXR trading resulted in profits of approximately $8,209. Relative 2
communicated with both Forlano and Relative 1 about the MAXR Deal after it was announced;
based on his communications with Relative 1, Relative 2 understood that Relative 1 made
substantial profits on his trades in MAXR.

**E.  Forlano Acted with Scienter in Tipping His Friends and Relatives.**

126.    Forlano tipped Relatives 1 and 2 and Friends 1 and 2 regarding HRMY, ECOM,
and/or MAXR based on the material nonpublic information he had received from Viggiano.

127.    Forlano unlawfully communicated those tips to Relatives 1 and 2 and Friends 1
and 2 based on material nonpublic information that he received from Viggiano. Forlano also
knew, was reckless in not knowing, or consciously avoided knowing that the tips he
communicated were based on material nonpublic information and would be used for trading.

**F. Forlano Obtained a Personal Benefit for Tipping His Friends and Relatives.**

128.    Forlano received a personal benefit from his tips to Relatives 1 and 2 and Friends 1 and 2 based on material nonpublic information from Viggiano, including the benefit of providing a gift of inside information to family members and close friends.

## VI.    BLECKLEY TIPPED OTHER TRADERS BASED ON MATERIAL NONPUBLIC INFORMATION THAT ORIGINATED WITH VIGGIANO.

**A. Bleckley Has a Close Personal Relationship with the People He Tipped.**

129.    As alleged above, Viggiano tipped his close friend, Forlano, with material nonpublic information regarding AIG, HRMY, and ECOM.  Forlano, in turn, tipped his close friend, Bleckley, based on the material nonpublic information regarding AIG, HRMY, and ECOM that Forlano received from Viggiano.

130.    Bleckley then passed those tips on to others for trading purposes, including tipping a close relative ("Bleckley Relative") about HRMY, and a former roommate and close friend ("Bleckley Friend") about ECOM. Bleckley had close personal relationships with the relative and friend he tipped.

**B. Bleckley Tipped his Relative about HRMY and ECOM, and the Relative Traded in HRMY Based on Bleckley's Tip.**

131.    On or before August 6, 2021, and based on the information he had received from Forlano, Bleckley told Bleckley Relative that he should buy HRMY.

132.    Between August 6 and August 9, 2021, Bleckley Relative bought a total of 400 shares of HRMY stock. On August 12, after the HRMY Deal was announced, Bleckley Relative sold all 400 shares of HRMY stock, resulting in trading profits of approximately $964.

133.    Sometime before September 6, 2022, and based on the information he had received from Forlano, Bleckley also used WhatsApp to tell Bleckley Relative that he should buy ECOM. Bleckley Relative did not buy ECOM securities.

**C.  Bleckley Tipped his Friend about ECOM, and the Friend Traded on Bleckley's Tip.**

134.    On or before September 6, 2022, Bleckley told Bleckley Friend that he should buy ECOM stock based on the material nonpublic information that Bleckley had received from Forlano.

135.    Between August 31 and September 1, 2022, Bleckley Friend bought a total of 269 shares of ECOM stock. On September 6, after the ECOM Deal was announced, Bleckley Friend sold all 269 shares of ECOM stock, resulting in trading profits of approximately $2,113.

**D.  Bleckley Acted with Scienter in Tipping His Friend and Relative.**

136.    Bleckley tipped Bleckley Relative regarding HRMY and Bleckley Friend regarding ECOM based on material nonpublic information that he received from Forlano, who in turn had received material nonpublic information about the HRMY and ECOM Deals from Viggiano.

137.    Bleckley unlawfully communicated those tips to Bleckley Relative and Bleckley Friend based on material nonpublic information that he received from Forlano. Bleckley knew, was reckless in not knowing, or consciously avoided knowing that the tips he communicated were based on material nonpublic information and would be used for trading.

**E.  Bleckley Obtained a Personal Benefit for Tipping His Friend and Relative.**

138.    Bleckley received a personal benefit from his tips to Bleckley Relative and Bleckley Friend, including the benefit of providing a gift of inside information to a family member and close friend.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(All Defendants)**

139.    The Commission re-alleges and incorporates by reference here the allegations set

forth above.

140.    As a result of the conduct alleged above, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

141.    By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder**
**(Viggiano and Salamone)**

142.    The Commission re-alleges and incorporates by reference here the factual allegations set forth above.

143.    By at least March 29, 2022, the entities that acquired CDK (the "offering person") took substantial steps to commence or did commence a tender offer for CSVI's shares of stock but the proposed tender offer was not publicly announced during this time.

144.    Between approximately March 29, 2022 and April 4, 2022, Defendants Viggiano and Salamone possessed material nonpublic information from the Investment Bank relating to the tender offer for CDK; knew or had reason to know that this information was nonpublic; knew or had reason to know that this information was acquired directly or indirectly from (a) the

offering person, (b) the issuer of the securities sought or to be sought by such tender offer, or

(c) any officer, director, partner or employee or any other person acting on behalf of such

offering person or such issuer; and purchased or sold, or caused to be purchased or sold, CDK's

securities; and/or communicated material nonpublic information relating to such tender offer to

one or more other persons under circumstances in which it was reasonably foreseeable that such

communication was likely to result in a violation of Exchange Act Rule 14e-3.

145.     By reason of the foregoing allegations related to the CDK Deal, Defendants

Viggiano and Salamone have violated and, unless enjoined, will again violate Exchange Act

Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3]

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Finding that Defendants violated the provisions of the federal securities laws as alleged

herein;

### II.

Permanently enjoining all Defendants and their agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5]; and permanently enjoining Defendants Viggiano and Salamone and their

agents, servants, employees and attorneys and all persons in active concert or participation with

any of them from violating, directly or indirectly, Exchange Act Section 14(e) [15 U.S.C.

§ 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

**III.**

Ordering all Defendants to disgorge all ill-gotten gains they received directly or

indirectly, with pre-judgment interest thereon, as a result of the alleged violations under Sections

21(d)(5) [15 U.S.C. § 78u(d)(5)] and 21(d)(7) [15 U.S.C. § 78u(d)(7)] of the Exchange Act;

**IV.**

Ordering all Defendants to pay civil monetary penalties pursuant to Exchange Act

Section 21A [15 U.S.C. § 78u-1]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.


Dated: September 28, 2023

*s/ Gregory A. Kasper*
Gregory A. Kasper
Ian Kellogg (pro hac vice forthcoming)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Denver Regional Office
1961 Stout Street, Suite 1700
Denver, CO 80294
(303) 844-1000
KasperG@sec.gov
KelloggI@sec.gov
